UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHIRLPOOL CORPORATION,<br><br>                    Plaintiff,<br><br>v.<br><br>NIDEC CORPORATION,<br><br>                    Defendant. | Case No. 19-cv-2155<br><br>**COMPLAINT** |

Plaintiff Whirlpool Corporation ("Whirlpool"), by and through its undersigned counsel, upon knowledge as to itself and otherwise upon information and belief, alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     This case is about the ongoing failure of defendant Nidec Corporation ("Nidec") to fulfill its express obligations under an agreement to buy a Whirlpool business unit.  Nidec agreed to "take any and all actions and do all things necessary" to secure antitrust approvals to enable the transaction to close before April 24, 2019—taking on what is commonly referred to as a "hell or high water" obligation.  But Nidec has not done whatever is necessary to secure all required antitrust approvals in time to close before April 24—and in fact has unreasonably prolonged and hindered the antitrust approval process.  Given that it is now March 8, Whirlpool has no alternative but to seek the Court's intervention to require Nidec to comply with its contractual obligations and to ensure that Whirlpool gets its bargained-for right to have all antitrust approvals secured in time to close the deal before April 24.

2.     In April 2018, Nidec and Whirlpool entered into a Share Purchase Agreement (the "SPA"), whereby Whirlpool agreed to sell Nidec a business called Embraco in exchange for approximately $1 billion (the "Transaction").  Nidec agreed that before the Transaction could

close, it would need to secure approvals from certain antitrust regulators, including the European

Commission ("EC").  Nidec committed to "take *any and all actions* and *do all things* necessary,

proper or advisable" to secure these antitrust approvals in time for the Transaction to close

before April 24, 2019 (the "HOHW Provision").  Nidec's obligation under the HOHW Provision

expressly includes "tak[ing] all actions, including agreeing to . . . divest, license or otherwise

dispose of any . . . businesses or properties or assets" of Nidec or its affiliates—on any terms—

necessary to obtain approval.  It is not limited or qualified in any way, shape or form.

3.     For the past ten months, Whirlpool has fully supported Nidec in its efforts to seek

antitrust approvals, going far beyond the support usually provided by a seller, even though

Whirlpool harbored serious concerns (which Whirlpool privately expressed to Nidec repeatedly)

that Nidec's approach was jeopardizing its ability to close before April 24.

4.     Whirlpool's concerns have been borne out again and again.  To date, Nidec still

has not secured the necessary approvals from the EC or from antitrust regulators in Turkey and

Mexico.  Nidec's failure is a direct result of a pattern of conduct improperly designed to

prioritize Nidec's business interests over its clear obligations under the SPA:

> (a)     Nidec caused delay by significantly falling behind the parties' agreed
> timeline for making submissions to the EC.

> (b)     Nidec then dragged its feet for over seven months, focusing on its own
> interests by (i) first attempting to persuade the EC that the Transaction did
> not pose any competition concerns (and thus to avoid having to offer any
> divestitures at all), and then (ii) refusing to offer the divestiture that clearly
> would have addressed the EC's concerns—namely, the sale of the entirety

of Nidec's refrigeration compressors business, known by the brand name "Secop."

(c)   Instead of accepting reality, Nidec submitted a series of five inadequate remedies, each of which ignored the EC's clearly expressed concerns and was swiftly rejected by the EC (as Whirlpool warned Nidec would happen). This process wasted time and forced the EC to move to a lengthy "Phase II" investigation—which could have been avoided had Nidec quickly offered to sell all of Secop during Phase I of the investigation.

(d)   After the EC delivered an ultimatum that only the sale of all of Secop would be a sufficient remedy, Nidec delayed another two weeks. Eventually, Nidec offered to sell most of Secop, but its proposal had significant exceptions and carve-outs and did not meet the EC's initial requirements. (After more delay, Nidec agreed to an acceptable scope of the Secop divestiture.)

(e)   When, on February 15, the EC subsequently required Nidec to (1) find an "upfront buyer" for Secop, and (2) contribute certain additional assets to Secop that Nidec had already budgeted, Nidec then delayed for almost one week before accepting the EC's upfront buyer requirement. Nidec also delayed almost two weeks from February 15 with respect to asset contribution, attempting to limit that requirement before finally reaching agreement with the EC on it.

(f)     To date, Nidec has failed to sign an agreement with an upfront buyer for Secop that would be acceptable to the EC, despite emphasizing to Whirlpool and the EC—many times—that Secop is a valuable and profitable business for which there are numerous interested buyers.  Nidec has told the EC (and Whirlpool) that it has received expressions of interest in or offers to purchase Secop, several of which are from buyers that should be acceptable to the EC.

(g)     Nidec also staged its approach to finding an upfront buyer for Secop, negotiating with only a single or small number of buyers at a time rather than soliciting offers from all potential buyers—attempting to maximize return (or minimize impact) to Nidec from the required divestiture. Nidec's failure to equally press *all* potential options caused further unwarranted delay, and constitutes a breach of its obligations under the HOHW Provision.

5.      If Nidec does not immediately sign an agreement with an acceptable upfront buyer, Nidec will fail to meet its "hell or high water" obligation to "divest, license or otherwise dispose of any of [its] businesses or properties or assets" as is required to resolve the EC's objections and permit the Transaction to close before April 24.  Even if Nidec signs an agreement with a buyer, the EC's internal processes could require several weeks for it to issue a formal decision approving the buyer and thus permitting the Transaction to close.  As it is now March 8, and also given the time required for pre-trial proceedings in advance of a ruling on Whirlpool's request for specific performance, time is up.

6.     Nidec's failure to secure approval from the EC and sign an agreement with an acceptable upfront buyer is entirely Nidec's own fault.  Nidec's unreasonable, prolonged refusal to meet the EC's requirements (first to sell all of Secop, and then with respect to additional requirements) has resulted in Nidec conducting a rushed, superficial divestiture process.  Despite the fact that the required asset contribution will be very attractive to potential Secop purchasers, Nidec did not offer the EC's initial asset contribution requirement to potential buyers, and on information and belief has still not offered the revised, agreed-upon asset contribution commitment to all potential buyers.  Additionally, Nidec has attempted to retain for itself a valuable part of the Secop business, and staged discussions by speaking with only certain potential buyers.

7.     Nidec cannot show that—if properly motivated—it would not be able to quickly identify an acceptable upfront buyer for Secop, particularly given the EC's asset contribution requirement, which will be attractive to potential buyers.  Nidec has repeatedly emphasized to Whirlpool and the EC that Secop is a profitable, valuable business that is attractive to potential buyers.  If Nidec offers to sell Secop on sufficiently attractive terms, Nidec could quickly reach a deal with a buyer that the EC would accept so that the Transaction can close before the contractual deadline of April 24.  If this does not do it, Nidec must contribute additional assets, or funding, to the package until it becomes sufficiently attractive to a suitable buyer.

8.     Complying with the EC's requirements will also enable Nidec to obtain the required approvals from antitrust regulators in Turkey and Mexico, which Nidec has not yet done.

9.     To be clear, Whirlpool did not want to bring this lawsuit, and it will continue—as it has for months—to coordinate with and support Nidec as it seeks to secure antitrust approvals.

Whirlpool hoped that Nidec would "take any and all actions and do all things necessary," as it is required to do, to timely satisfy its obligations under the HOHW Provision.  Unfortunately, Nidec has not done so, and Whirlpool has been forced to bring this action to ensure that it gets the benefit of its bargain:  that, come hell or high water, Nidec would obtain antitrust approvals in time in order to permit closing before April 24, 2019.

10.     Specifically, Whirlpool seeks an order (i) requiring Nidec to enter into an agreement to sell Secop (including any additional Nidec assets, or funding, as necessary) at no minimum price, with an upfront buyer that is acceptable to the EC and in time for the Transaction to close before April 24, or alternatively, (ii) if Nidec fails to do so, appointing a trustee fully empowered to immediately sell Secop (and any additional Nidec assets, or funding, as necessary) at no minimum price to any buyer that the EC will approve, so that the Transaction may close before April 24.  Whirlpool further asks the Court to require Nidec to take any and all other steps required to fulfill its obligations under the SPA and obtain timely approvals in the European Union, Turkey and Mexico to permit closing before April 24.

## PARTIES

11.     Plaintiff Whirlpool is a corporation organized under the laws of Delaware, with its principal place of business at 2000 North M-63, Benton Harbor, Michigan.

12.     Defendant Nidec is a corporation organized and existing under the laws of Japan, with its principal place of business at 338 Kuzetonoshiro-cho, Minami-ku, Kyoto 601-8205, Japan.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2).  Whirlpool is a citizen of two U.S. states (Delaware and Michigan), and

Nidec is a citizen of a foreign state (Japan).  *See* 28 U.S.C. § 1332(c)(1).  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because the value of the object of the litigation to Whirlpool exceeds $75,000, exclusive of interest and costs.

14.     Whirlpool and Nidec (together, the "Parties") have agreed that "each Party shall have the right to injunctive relief and specific performance in the event that any provision of [the SPA] is not performed in accordance with the terms [thereof] in any court of the United States or any state having jurisdiction . . . ."  SPA § 11.15.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(3), because Nidec is not resident in the United States and therefore may be sued in any judicial district of the United States.

## BACKGROUND

I.     **NIDEC AND WHIRLPOOL ENTER INTO AN AGREEMENT FOR THE SALE OF EMBRACO, AND NIDEC COMMITS TO TAKE ALL NECESSARY ACTIONS TO SECURE ANTITRUST APPROVALS COME "HELL OR HIGH WATER"**

16.     Whirlpool manufactures home appliances and related products.  Whirlpool has a business unit called Embraco, which manufactures refrigeration compressors.

17.     Embraco is headquartered in Joinville, Santa Catarina, Brazil, and it operates plants in Brazil, China, Mexico and Slovakia.

18.     Nidec engineers, manufactures and distributes electric motors and related products.  In 2017, Nidec acquired Secop, an Embraco competitor that also manufactures and sells refrigeration compressors and operates plants in China, Slovakia and Austria.

19.     Refrigeration compressors are devices that compress vaporized refrigerant and are integral to cooling the air in refrigerators and freezers.  Compressors made by Embraco and Secop are installed in refrigerators and freezers used in a variety of applications.

20.     Refrigeration compressors can be divided into categories based on their intended use, including household compressors (*e.g.*, those used in home refrigerators and freezers) and light commercial compressors (*e.g.*, those used in soft drink coolers and vending machines).

21.     On April 24, 2018, Nidec and Whirlpool entered into the SPA[1] for Nidec's purchase of Embraco for $1.08 billion.  The Transaction would result in Nidec owning both Secop and Embraco (the "Combined Entity").

22.     The SPA contains a number of provisions relevant to this dispute:

(a)     <u>Conditions to Closing</u>:  Before the Transaction can close, Nidec must obtain approvals from antitrust authorities in a number of specified jurisdictions: Brazil, China, the European Union, Mexico, Russia, Turkey, the United States and Colombia.  §§ 7.1.1, 2.2.

(b)     <u>HOHW Provision</u>:  To provide Whirlpool with the certainty that Nidec will obtain all necessary antitrust approvals in a timely matter, Nidec agreed to a HOHW Provision, requiring Nidec to take any and all actions—including divesting any or all necessary portions of Nidec's existing business (not limited to Secop) or Embraco—to ensure that all antitrust approvals are obtained in time for the Transaction to close before the Initial Outside Date, which is expressly defined as April 24, 2019:

> (i)  *[Nidec] shall take any and all actions and do all things necessary, proper or advisable* to enable all waiting periods (including any extensions thereof) under any Competition Law to expire or terminate, and for any appropriate Consents under any Competition Law to be received, and to avoid or eliminate each and every impediment under any Competition Law asserted by any Governmental Authority

[1]      The full SPA was filed with the SEC and is available online.  *See* Whirlpool Corp., Current Report, exh. 2.1 (Form 8-K) (Apr. 24, 2018), https://www.sec.gov/Archives/edgar/data/106640/000119312518127576/d574917dex21.htm.

or third party, in each case, *in order to cause the transactions contemplated by this Agreement to occur prior to the Initial Outside Date*.

. . .

(v)  If any objections are asserted with respect to the transactions contemplated hereby under any Competition Law . . . , *[Nidec] shall . . . take all actions, including agreeing to hold separate or to divest, license or otherwise dispose of any of the businesses or properties or assets of [Nidec], any of its Affiliates, or [Embraco],* as may be required (x) by the applicable Governmental Authority in order to resolve such objections as such Governmental Authority may have to such transactions under the applicable Competition Law and *permit Closing prior to the Initial Outside Date* . . . .

§ 5.2.4 (emphasis added).

(c)     <u>Closing Date</u>:  Whirlpool and Nidec have one year from execution of the

SPA (April 24, 2018) to close the Transaction.  § 8.1.2.  Subject to certain

conditions, either party may elect to extend the Initial Outside Date for six

months to October 24, 2019, which is defined as the "Second Outside

Date."  § 8.1.2.  However, this potential extension does not impact the

HOHW Provision, which does not reference any potential extension (or

the Second Outside Date), and expressly requires Nidec to "take any and

all actions and do all things necessary, proper or advisable" with respect to

securing antitrust approvals "in order to cause the transactions

contemplated by this Agreement to occur prior to the *Initial Outside

Date*"—and not any other date.

(d)     <u>Governing Law</u>:  The SPA is governed by New York law.  § 11.13.

9

(e)   <u>Specific Performance</u>:  The SPA expressly grants the Parties the right to seek injunctive relief and specific performance—in any U.S. federal court—to enforce their rights under the SPA:

> The Parties acknowledge that irreparable damage would occur in the event that any provision of this [SPA] were not performed in accordance with the terms hereof, that there may be no adequate remedy at law for a breach of this [SPA] and that money damages may not be an appropriate remedy for such breach.  *The Parties accordingly agree that each Party shall have the right to injunctive relief and specific performance in the event that any provision of this [SPA] is not performed in accordance with the terms hereof* in any court of the United States or any state having jurisdiction in addition to any rights it may have for damages, and the Parties hereby agree to . . . not raise any objection to the availability of the equitable remedy of specific performance . . . .

§ 11.15 (emphasis added).

(f)   <u>Indemnification</u>:  Nidec must indemnify and hold harmless Whirlpool "from and against any and all Losses resulting from or arising out of . . . *any failure of [Nidec] to perform any covenant or agreement hereunder . . . .*"  § 9.2.1 (emphasis added).  The SPA defines "Losses" as "any and all liabilities and obligations, Taxes, losses or damages (whether absolute, accrued, conditional or otherwise) and *out-of-pocket expenses and reasonable and documented attorneys' and accountants' fees and expenses*, whether involving a Third Party Claim or *a claim solely between the Parties* (collectively, 'Losses') . . . ."  § 9.1 (emphasis added).

23.   The HOHW Provision—which by its express terms requires Nidec to take "any and all actions" to secure antitrust approvals, including "agreeing to . . . divest, license or

otherwise dispose of" *any* assets at *any* price, in order to close before April 24, 2019—was specifically negotiated and was a material term of the Transaction.

## II. THE PARTIES RECOGNIZE THE IMPORTANCE OF SECURING TIMELY APPROVALS FROM THE EC AND OTHER AUTHORITIES

24.     From the start, Nidec and Whirlpool recognized that Nidec would be required to obtain antitrust approvals from a number of jurisdictions (the United States, the European Union, China, Brazil, Colombia, Mexico, Russia and Turkey) as a condition to closing.

25.     Of these jurisdictions, Nidec and Whirlpool recognized that obtaining approval from the EC, the antitrust regulatory authority of the European Union/European Economic Area, would require particular attention.  In part due to the strong and overlapping presence of Embraco's and Secop's compressor businesses in Europe, the Parties understood that the EC would likely conduct a careful, extensive review of the Transaction.  Indeed, when Secop acquired a competing compressor business in 2013, the EC closely reviewed the transaction.[2]

26.     The EC's review of the Transaction would focus on three related issues:

(a)     <u>Relevant Markets</u>:  The EC would identify the relevant markets for evaluating the Transaction's antitrust concerns.  Markets have both a geographic component (*e.g.*, global vs. Europe) and a product component (*e.g.*, all compressors vs. separate markets for household compressors and light commercial compressors).

(b)     <u>Competitive Assessment</u>:  The EC would then assess, with respect to each relevant market (*e.g.*, "light commercial compressors in Europe"), whether the Transaction would harm competition.  This assessment would depend

---

[2] *See* Case No. COMP/M.6996, *Secop/ACC Austria*, Commission Decision of Nov. 12, 2013, http://ec.europa.eu/ competition/mergers/ cases/decisions/m6996_583_2.pdf.

on several factors, including (but not limited to) market shares.  Nidec

knew that the EC could—as it ultimately did—define relevant markets in a

way that would lead to very high combined market shares for Embraco

and Secop in certain segments.

(c)     <u>Remedy</u>:  If the EC decided that the Transaction would harm competition

in one or more relevant markets, the EC would prohibit the Transaction

unless Nidec offered an adequate remedy to address the EC's concerns.

The remedy would likely entail divesting the majority, if not all, of

Secop's or Embraco's business, so as to restore the competition that

existed between Secop and Embraco prior to the Transaction.  The EC

could also require that Nidec's remedy include an "upfront buyer,"

meaning that the Transaction could not close until the EC approved a

buyer that had signed an agreement to acquire the divested business.

27.     In general terms, the EC's review process requires applicants to make formal

submissions to the EC, respond to the EC's requests for information and engage with the EC

over any concerns it might have about the transaction at issue.  The EC also engages in an

independent investigation of the relevant markets that might be affected by the transaction at

issue, including by soliciting feedback from customers, competitors and other market

participants.

28.     The EC's review process unfolds in two or three distinct phases: (1) the pre-

notification phase, (2) the Phase I investigative period, and, if necessary, (3) the Phase II

investigative period.  The EC can, and frequently does, approve transactions during Phase I if it

determines that there are no competition concerns or that the applicants have offered clear-cut

remedies to address any such concerns.  For the small minority of transactions that are not
cleared at the end of Phase I, the EC commences Phase II of its review.  At the end of Phase II,
the EC makes a final decision as to whether or not to approve the transaction and allow it to
close.  A more detailed explanation of the EC's review process is described in Annex A.

29.     Given the April 24 deadline, it was critical that Nidec secure EC approval during
Phase I and not force the EC to open Phase II of its investigation, which on average takes more
than five months to complete.

30.     Whirlpool therefore urged Nidec to do everything possible to secure EC approval
in Phase I.  Whirlpool advised Nidec that it was critical for Nidec to understand, as early as
possible, the EC's likely views as to the relevant markets and any competition concerns the EC
might have about each market as a result of combining Embraco and Secop, and then promptly
offer an adequate remedy to resolve the EC's concerns.  Whirlpool noted that the EC and other
regulators would conduct a careful review, given Secop's and Embraco's high shares in certain
segments of the compressor market, and encouraged Nidec to prepare a suitable remedy
proactively.  Whirlpool further advised that delay in this process, and particularly if the EC's
review entered Phase II, could jeopardize Nidec's ability to get approvals in time for the
Transaction to close before April 24, 2019.

## III.   NIDEC QUICKLY FALLS BEHIND THE PARTIES' AGREED-UPON TIMELINE FOR SECURING EC APPROVAL BEFORE APRIL 24

31.     Adhering to a strict timeline was essential to ensure that Nidec would secure EC
approval in time for the Transaction to close before April 24.  In early May, the Parties agreed to
a timeline under which Nidec was to file a draft "Form CO" (an application to the EC for
approval of the Transaction) in late May and file the final Form CO in early September.  The
timeline also acknowledged that the EC's review period could be extended as late as March or

April 2019 if the EC opened a Phase II review.  Therefore, it was acknowledged by the Parties that it was critical they (i) adhere to the timeline, and (ii) avoid a Phase II review.

32.     However, Nidec began to lag behind this timeline almost immediately.  This occurred in spite of Whirlpool's significant efforts to assist Nidec in preparing materials for the EC, which went well beyond the level of cooperation typically provided by a seller.  As a result of Nidec's delays, Nidec did not file its draft Form CO until July 4, over a month after the agreed-upon late-May deadline.  Nidec ultimately submitted its final Form CO to the EC on October 8, 2018, a month after the agreed-upon early September deadline.

## IV.     NIDEC WASTES VALUABLE MONTHS BY MAKING FUTILE ARGUMENTS THAT NO REMEDY SHOULD BE REQUIRED AND THEN OFFERING CLEARLY INADEQUATE REMEDIES

33.     Seeking to protect its own financial interests, Nidec also wasted months making arguments it knew the EC would reject—*i.e.*, that the Transaction would not pose any competition concerns and that no remedy of any type should be required.

34.     From the start, it was clear to Whirlpool (and must have been clear to Nidec's own lawyers and economists) that Nidec's no-remedy approach would never succeed given the overlapping market shares of Embraco and Secop.  As early as May 30, the EC indicated to Nidec that the Transaction posed serious competition concerns.  The EC reiterated its concerns later that summer, making its concerns very clear on August 10.

35.     On October 29, 2018, the EC informed Nidec that it had received overwhelmingly negative feedback about competition concerns raised by the Transaction from almost every major customer and competitor.  The EC emphasized that it had serious concerns about the anticompetitive effects of the Transaction in multiple relevant markets.  The EC made clear that, unless Nidec offered a clear-cut structural remedy (*i.e.*, an adequate divestiture to an acceptable

buyer) that addressed all competition concerns, the EC would refuse to approve the Transaction in Phase I and would instead open a Phase II review.

36.     The obvious remedy to address the EC's concerns was to divest all of Secop—a clear-cut structural remedy that would have addressed all of the EC's concerns.  However, Nidec did not offer this remedy, or even signal a willingness to discuss it.  Instead, on November 6, just one day before the EC's deadline, Nidec belatedly submitted its first offer, which proposed to divest only Secop's Slovakian plant (and neither of its other two plants).  The EC rejected Nidec's proposal that very day.

37.     Nidec then proceeded to submit a series of incrementally revised offers that were all clearly inadequate to address the EC's concerns and were all quickly rejected by the EC. Each time the EC rejected Nidec's incremental tinkering reinforced that the only remedy that would satisfy the EC's concerns and secure approval for the Transaction was an offer to divest all of Secop, including Secop's Austrian plant.

38.     On November 17, Whirlpool advised Nidec that the only remedy that would satisfy the EC and avoid a Phase II investigation was to divest all of Secop.  However, Nidec refused to offer this remedy.

39.     Nidec's Phase I offers—and the EC's rejections—are summarized as follows:

| Nidec's Proposed Remedy | Date Nidec Made Offer | Date EC Rejected |
|---|---|---|
| Secop Slovakian plant | 11/6/18 | 11/6/18 |
| Secop Slovakian plant + Embraco Slovakian production line | 11/7/18 | 11/8/18 |
| Secop Slovakian plant + production line from Secop Chinese plant + 2-year license to Secop brand + IP licenses with limited applicability | 11/9/18 | 11/9/18 |
| Secop Slovakian plant + production line from Secop Chinese plant + 2-year license to Secop brand + IP licenses with slightly broader applicability | 11/9/18 | 11/16/18 |
| Secop Slovakian plant + production line from Secop Chinese plant + sale of Secop brand (with license-back) + IP licenses | 11/19/18 | 11/19/18 |

## V.     AS A DIRECT RESULT OF NIDEC'S REFUSAL TO OFFER AN ADEQUATE REMEDY, THE EC COMMENCES PHASE II OF ITS INVESTIGATION, AND NIDEC CAUSES FURTHER DELAY

40.     As a result of Nidec's repeated refusals to offer an adequate remedy, the EC

issued a formal decision on November 28, 2018, declining to approve the Transaction and

commencing Phase II of its review.  The EC found that Nidec's proposed remedies had "serious

shortcomings" and did not address the EC's competition concerns about the Transaction.

41.     Following the EC's decision, and despite its clear directive, Nidec continued for

several weeks to refuse to offer to sell all of Secop.

42.     On January 23, the EC's Head of Mergers expressly stated that the EC would

issue a Statement of Objections ("SO")—a formal step toward blocking the Transaction—unless

Nidec committed to sell all of Secop, including its Austrian plant.  Finally, on January 30 (an

unnecessarily prolonged seven days later), Nidec submitted a draft offer to divest most of Secop (including the Austrian plant)—but not all of Secop.

43.     Nidec then proceeded to haggle with the EC over a variety of elements of the proposed draft remedy.  Nidec did not submit a formal offer that included the Austrian plant until February 7.  Throughout, Nidec repeatedly represented to the EC that Nidec had a number of interested buyers for Secop.

44.     On February 15, the EC informed the Parties that it had, among other things, two issues with Nidec's formal remedy offer.  First, the EC stated that it would require Nidec to include an upfront buyer as a part of its remedy.  Second, the EC asked Nidec to contribute to the divestiture certain additional assets (which Nidec had already budgeted).

45.     Nidec delayed for almost a week, until February 21, before finally agreeing to the EC's upfront buyer requirement.

46.     Nidec also delayed almost two weeks, until February 28, with respect to the asset contribution, haggling over the amount, timing and conditions before finally reaching agreement with the EC on it—while knowing that purchasers would find the required asset contribution attractive.  Indeed, in the face of Nidec's unwarranted delay in accepting the EC's February 15 requirements, the EC was forced to say that it would issue an SO in the first week of March if Nidec did not make appropriate commitments with respect to both an upfront buyer and asset contribution.

47.     Nidec's unreasonable, prolonged refusal to meet the EC's requirements (first to sell all of Secop, and then additional requirements) has resulted in Nidec conducting a rushed and superficial divesture process.  Worse, Nidec has sought to divest Secop on terms that are favorable to Nidec, rather than terms that will attract potential buyers and result in a timely sale.

The EC's asset contribution requirement will be very attractive to purchasers and actually help Nidec secure an upfront buyer. Yet Nidec never marketed Secop with the EC's initial asset contribution requirement, and on information and belief, Nidec has not yet gone back and marketed Secop to all potential buyers with the revised, agreed-upon asset contribution commitment—as Whirlpool has repeatedly requested. Additionally, Nidec has attempted to retain a valuable part of Secop for itself.

48.     Nidec also staged its approach to finding a buyer for Secop—negotiating with only a single or small number of buyers at a time rather than soliciting offers from all potential buyers and under any terms. Such staging caused further delay and separately breached Nidec's obligations under the HOHW Provision.

49.     Nidec's failure to reach a deal with an acceptable upfront buyer is entirely Nidec's own fault. Nidec cannot show that—with full shopping and the right set of terms—it would not be able to quickly identify an acceptable upfront buyer for Secop, given both the EC's asset contribution requirement (which will be attractive to buyers) and Nidec's repeated emphasis to both Whirlpool and the EC that Secop is a profitable, valuable business that is attractive to potential buyers. Nidec has told the EC (and Whirlpool) that it received letters of interest in or offers for the sale of Secop from more than one buyer that should be acceptable to the EC. Yet, to date, Nidec has not accepted a single offer that the EC would approve.

50.     Nidec has many options—and a contractual obligation—to make the Secop business sufficiently attractive to acceptable buyers. These include lowering the asking price, offering more attractive terms, offering to pre-fund additional investments at Secop or adding additional assets to the sale package, whether from Secop, Embraco or Nidec's motor or other businesses. All of this is required by the SPA.

51.     Nidec's ongoing failure to sign a sale agreement with an acceptable upfront buyer is therefore a breach of its obligations under the HOHW Provision.

52.     On February 24, Whirlpool wrote to notify Nidec that Nidec was in breach of its obligations under the SPA and that, given the approaching April 24 deadline, Whirlpool would be forced to file this action by March 1 if Nidec did not immediately accept all of the EC's demands and sign an agreement for the sale of Secop with a buyer acceptable to the EC.  Nidec responded by letter on February 28, disagreeing with some of Whirlpool's points and asking that Whirlpool not file suit.

53.     After subsequent discussions, Whirlpool agreed to delay filing a lawsuit until March 8.  Whirlpool made clear, however, that it would be forced to sue on March 8 unless Nidec (i) provided full transparency into the Secop sale process; (ii) had signed, or was very close to signing, an agreement with a buyer the EC indicated would be acceptable; and (iii) had contacted all potential bidders in case the limited number of potential buyers Nidec was negotiating with withdrew from the process or were not approved by the EC.

54.     It is now March 8, and Nidec still has not signed an agreement with an upfront buyer for Secop found to be acceptable by the EC. Given that the EC's internal processes could require several weeks to approve an upfront buyer and thus permit the Transaction to close, Nidec has not taken "all actions necessary" to secure antitrust approvals in order to allow closing to occur before April 24, 2019.  Moreover, given the EC's processes and also the time required for pre-trial proceedings in advance of a ruling on Whirlpool's request for specific performance, Whirlpool is constrained to file this action now.

## VI.     NIDEC ALSO FAILS TO SECURE ANTITRUST APPROVALS IN OTHER JURISDICTIONS

55.     Nidec's unreasonable positions (and delays) before the EC have also jeopardized Nidec's ability to secure antitrust approvals in Turkey and Mexico, which are also required for the Transaction to close before the April 24, 2019 deadline.

56.     Specifically, Nidec's failure to secure Phase I approval from the EC jeopardized Nidec's ability to obtain antitrust approval in Turkey.  After expressing competition concerns about the Transaction, the Turkish Competition Authority ("TCA") agreed to delay opening its Phase II investigation until the EC had reviewed Nidec's remedy proposal in November.

57.     The TCA opened its Phase II investigation on December 28, 2018, and continued to express competition concerns about the Transaction.  Nevertheless, Nidec has not yet secured TCA approval.

58.     Nidec has also delayed antitrust approval in Mexico, as it has not yet secured approval of the Federal Competition Commission of Mexico.

## VII.    WHIRLPOOL HAS FULLY COOPERATED WITH NIDEC IN PURSUING ANTITRUST APPROVALS

59.     Throughout the past ten months, Whirlpool has fully cooperated with Nidec in pursuing antitrust approvals and in assisting Nidec with fulfilling its obligations under the SPA to obtain the necessary regulatory approvals in time for the Transaction to close before April 24.

60.     For example, Whirlpool has:

(a)     Supported Nidec's arguments to the EC at numerous joint meetings and calls with the EC and in submissions to the EC;

(b)     Made Whirlpool's and Embraco's employees available for Nidec and the EC to speak with (including flying employees from Brazil and the United States to Belgium the week before Christmas, at very short notice);

(c)     Provided information and data, including Whirlpool's internal data about other compressor manufacturers and Whirlpool's plans (as a purchaser) regarding other compressor manufacturers, to supplement and strengthen Nidec's applications to the regulators;

(d)     Timely provided information and documents to antitrust regulators, including the EC (for the EC alone, Whirlpool answered 15 sets of requests for information and produced hundreds of thousands of documents); and

(e)     Provided timely comments to Nidec regarding its submissions and responses to the EC's information requests.

## COUNT ONE

## REQUEST FOR SPECIFIC PERFORMANCE

## BREACH OF THE SPA

61.     Whirlpool hereby repeats and realleges the allegations set forth above as if fully set forth herein.

62.     The SPA is a valid and binding contract.

63.     Nidec has materially breached the SPA by failing to comply with its obligations under the HOHW Provision.  Among other things:

(a)     Nidec failed to make submissions to the EC in a timely manner.

21

(b)    Prior to and during Phase I of the EC's review, Nidec improperly prioritized its own business interests of (i) preserving any possibility—no matter how unrealistic—of avoiding a divestiture, and (ii) prioritizing its desire to reduce the scope of any divestiture over fulfilling its obligations under the SPA to take all actions required to timely secure antitrust approvals, thereby forcing the commencement of Phase II of the EC's review.

(c)    During Phase II of the EC's review, Nidec unreasonably haggled with the EC and refused to offer to divest all of Secop until the EC was forced to issue an ultimatum, adding more delay and leaving only a limited amount of time to run a sale process.

(d)    Nidec then delayed in agreeing to the EC's upfront buyer requirement, and also delayed—and haggled with the EC over—the asset contribution requirement, which also limited the attractiveness of the Secop business to potential buyers.

(e)    Nidec staged its approach to finding an upfront buyer for Secop, negotiating with only a single or small number of buyers at a time rather than soliciting offers from all potential buyers—attempting to maximize return (or minimize impact) to Nidec from the required divestiture, rather than pressing all potential options.

(f)    Nidec has failed to sign a deal with an upfront buyer for Secop that is acceptable to the EC, despite repeatedly representing that Secop is a profitable business.  Throughout, Nidec has pursued a haphazard process

22

that was not designed to *timely* find a buyer at any price and on any terms, as required by the SPA.

(g)     Nidec has failed to offer the divestitures necessary to secure antitrust approvals in Turkey and Mexico.

64.     The Parties have expressly agreed that (i) Whirlpool "shall have the right to injunctive relief and specific performance in the event that any provision of [the SPA] is not performed in accordance with the terms"; (ii) "irreparable damage would occur in the event that any provision of [the SPA] were not performed in accordance with the terms"; and (iii) Nidec will not "raise any objection to the availability of the equitable remedy of specific performance." SPA § 11.15.  The Parties have also expressly waived any requirements for posting a bond in connection with an action seeking injunctive relief and specific performance.  § 11.15.

65.     Nidec's material breaches threaten to prevent Whirlpool from receiving the benefit of the Parties' bargain, which would result in irreparable harm to Whirlpool.

66.     Whirlpool has no adequate remedy at law.  Therefore, an injunction is appropriate.

67.     Nidec should be ordered to sell Secop (and any additional Nidec assets, or funding, as necessary) immediately to any buyer acceptable to the EC at no minimum price and at whatever terms are required to effect an immediate sale.

68.     As an alternative, if Nidec fails to enter into an agreement to sell Secop, the Court should appoint a trustee who is fully empowered to immediately sell Secop (and any additional Nidec assets, or funding, as necessary) to a buyer that is acceptable to the EC, at no minimum price.  The trustee should be authorized to, at Nidec's expense: retain legal counsel and financial advisors; add to the divestiture any and all non-Secop Nidec assets required to secure an

23

agreement with an acceptable upfront buyer; and have full access to documents, data and other information in Nidec's (or its financial advisors') possession relevant to the sale of Secop (and any additional Nidec assets as necessary).

69.     Whirlpool has fulfilled all of its obligations under the SPA and stands ready, willing and able to close the Transaction.

## PRAYER FOR RELIEF

WHEREFORE, Whirlpool prays for judgment against Nidec:

a.     Ordering Nidec to perform its obligations under the SPA by:

i.     Immediately reaching an agreement with a buyer that the EC informs the Parties is likely to be acceptable to the EC, to sell Secop (and any additional Nidec assets or funding as necessary) at whatever price and terms it takes to secure an immediate sale, as required by Section 5.2.4(v) of the SPA.

ii.     Alternatively, if Nidec fails to enter into an agreement to sell Secop as required by Section 5.2.4(v) of the SPA, appointing a trustee fully empowered to sell Secop (and any additional Nidec assets, or funding, as necessary) immediately, at no minimum price to a buyer acceptable to the EC.

iii.     Providing Whirlpool with a full and continuing explanation of, and all documents regarding, negotiations between Nidec and any potential buyers for the sale of Secop, including any and all offers already submitted, any drafts and markups of any purchase agreements and any

discussions on timing of the transaction, as required by Section 5.2.4(vii) of the SPA.

    iv.   Promptly taking any and all additional actions necessary to secure antitrust approvals in the European Union, Turkey and Mexico to enable the Transaction to close before April 24, 2019, as required by Section 5.2.4(i) of the SPA.

    v.   Providing any and all information requested by the EC or other antitrust authorities on a timely basis, as required by Sections 5.2.4(ii) and 5.2.4(iv) of the SPA.

b.    Awarding Whirlpool costs in this action and attorneys' fees, as authorized by Section 9.2.1 of the SPA or otherwise.

c.    Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 8, 2019

                              Respectfully submitted,

                              CLEARY GOTTLIEB STEEN & HAMILTON LLP


                              By:  */s/ Meredith E. Kotler*
                              Meredith E. Kotler
                              (mkotler@cgsh.com)
                              Roger A. Cooper
                              (racooper@cgsh.com)
                              David E. Wagner
                              (dwagner@cgsh.com)
                              Vanessa C. Richardson
                              (vrichardson@cgsh.com)

                              One Liberty Plaza
                              New York, New York 10006
                              Telephone:  (212) 225-2000
                              Facsimile:  (212) 225-3999

                              *Attorneys for Plaintiff Whirlpool Corporation*